```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                         :
WAYNE WURTSBAUGH, PETRUS VAN ZYL, JACK L. :
DIXON, indvidually and as Trustee of the :
Jack Lee Dixon Family Trust, and GEORGE A:   05 CIV. 6220 (DLC)
PELLETIER,                               :
                                         :
                Plaintiffs,              :
                                         :   OPINION AND ORDER
        -v-                              :
                                         :
BANC OF AMERICA SECURITIES LLC,          :
                                         :
                Defendant.               :
                                         :
---------------------------------------- X
```

Appearances

For Plaintiffs Wayne Wurtsbaugh, Petrus
Van Zyl, Jack L. Dixon, indvidually and as
Trustee of the Jack Lee Dixon Family
Trust, and George A. Pelletier:
Daniel Kornstein
Daniel Cohen
Kornstein Veisz Wexler & Pollard, LLP
757 Third Avenue
New York, NY 10017

Drew Bagot
Gerald Urbach
R. Scott Seifert
Austin Evans
Hiersche, Hayward, Drakeley & Urbach, P.C.
15303 Dallas Parkway
Suite 700
Addison, TX 75001

For Defendant Banc of America Securities
LLC:
Stuart Krause
Kenneth Rudd
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, NY 10022

DENISE COTE, District Judge:

This diversity action arises out of the sale of Direct Access Financial Corporation ("DAFC") to defendant Banc of America Securities LLC ("Banc of America"). The plaintiffs, Wayne Wurtsbaugh ("Wurtsbaugh"), Petrus Van Zyl, Jack Dixon both

individually and as a trustee of the Jack L. Dixon Family Trust, and George Pelletier are the founders and former principals of DAFC. In 2004, they sold the assets of DAFC to Banc of America through an Asset Purchase Agreement ("Agreement") and Wurtsbaugh joined Banc of America as an employee pursuant to a separate employment agreement. Plaintiffs claim that they were fraudulently induced into accepting the Agreement and that Banc of America has violated both the spirit and the letter of the contract. Plaintiffs claim breach of contract, unjust enrichment, and fraud under New York law and seek either damages or recission of the contract and damages. Plaintiffs also seek a declaratory judgment that non-compete clauses in the Agreement and in Wurtsbaugh's employment letter are unenforceable. Banc of America has moved to dismiss all of the plaintiffs' claims in their amended complaint, filed on December 13, 2006 ("Complaint"), pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth in this Opinion, the defendant's motion is granted in part.

## Background

The following facts are taken from the Complaint, and the Agreement and the Wurtsbaugh employment letter, documents which are integral to the Complaint. The plaintiffs developed InstaQuote, software used to access securities markets for executing trading strategies and receiving market data, and founded DAFC in 2000. By 2003, DAFC provided direct market execution services for over twenty-five securities broker-dealers

and interfaced with fifteen different clearing firms.[1]

In May 2003, Banc of America began discussions with DAFC about a possible acquisition. The discussions bore fruit. On February 21, 2004, plaintiffs, DAFC and Banc of America signed the Agreement, which sold all of DAFC's assets, including InstaQuote, to Banc of America. Under the Agreement, what was formerly DAFC would continue to operate as part of Banc of America, and would be called the DAF Division. Wurtsbaugh and some of DAFC's employees were hired by Banc of America to operate the DAF Division as part of the Agreement.

The Agreement calls for three types of payments by Banc of America. First, Banc of America is to pay up to $50 million to DAFC, structured as three installments of $15 million[2] and an additional $5 million target payment if the DAF Division meets certain performance goals in 2004 ("2004 Target Payment"). The payments of up to $50 million are referred to in the Agreement as the "Purchase Price".

Second, Banc of America agreed to three contingent payments to be paid in 2005, 2006 and 2007 ("Contingent Payments"). The value of those payments is determined by the growth of the DAF

---

[1] A clearing firm "completes transactions by delivering securities to the purchasing broker-dealer and by making money payments to the selling broker-dealer." Levitt v. Bear Stearns & Co., Inc., 340 F.3d 94, 97 (2d Cir. 2003) (citation omitted).

[2] The first payment was due on closing. The second payment was due 120 days after closing, and the third payment was due 240 days after closing.

Division's business.[3] That business is defined in the Agreement as "the business of developing, marketing, licensing and distributing" the InstaQuote software and other related software. Growth is measured for two separate groups of customers: (1) prime brokerage customers of Banc of America ("Prime Clients") and (2) other customers who adopt InstaQuote ("Non-Prime Clients").

Third, the Agreement provides for a revenue pool ("Revenue Pool"), based on a formula that is in large part identical to the formula used to calculate the Contingent Payments. The Revenue Pool was to be distributed to, among others, a number of the DAFC employees that were hired by Banc of America under the Agreement. None of the plaintiffs were listed in the Agreement as receiving payment from the Revenue Pool.[4]

The Agreement also contained the following covenant governing "Reasonable Best Efforts" ("Best Efforts Clause"):

> Subject to the terms and conditions of this Agreement, each of the Parties hereto agrees to use all reasonable efforts to take, or cause to be taken, all appropriate action, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement; provided, however, that nothing in this Agreement shall obligate [Banc of America] or any of its Affiliates to agree (a) to limit or not to exercise any rights of ownership of [DAFC's business], or to divest, dispose of or hold separate all or any portion of the respective businesses, assets or properties or

---

[3] The Contingent Payments were capped at an aggregate of $70 million, unless the 2004 Target Payment was not earned, in which case they could be worth an aggregate of $73.5 million.

[4] 6.0% of the Revenue Pool was left unallocated under the Agreement.

4

>     [sic] of [DAFC's businesses] or (b) <u>to limit in any
>     manner whatsoever the ability of such entities (i) to
>     conduct their respective businesses or own such assets</u>
>     or properties or to own and operate [DAFC's business]
>     <u>or (ii) to control their respective businesses</u> or
>     operations of the businesses or operations or [DAFC's
>     business] or its operations.

(emphasis supplied).

Finally, the Agreement was a fully integrated document. It included a clause entitled Entire Agreement; Assignment ("Merger Clause") which stated in relevant part:

> This Agreement and the applicable Employment Letters
> <u>constitute the entire agreement</u> among the Parties with
> respect to the subject matter hereof <u>and supersedes
> [sic] all prior</u> agreements and <u>undertakings</u>, both
> written and oral, among the parties, or any of them,
> with respect to the subject matter hereof.

(emphasis supplied). A separate clause required any amendment to be in writing: "any term of this Agreement <u>may be amended</u>, and the observance of any term of this Agreement <u>may be waived</u>...<u>only by an instrument in writing</u>." (emphasis supplied).

The plaintiffs allege that a critical factor in choosing to sell DAFC to the defendant was certain "representations" made by Banc of America concerning the opportunity for DAFC to grow and increase revenue by linking it to Banc of America's clearing operation. During negotiations leading up to the sale Wurtsbaugh discussed the importance of combining DAFC's software and Banc of America's clearing operation with Ross Stevens ("Stevens"), Chief Operating Officer of Banc of America Securities Global Equities, and Guillermo Cortina ("Cortina"), a Senior Manager of Corporate Planning at Banc of America.

After the Agreement had been signed, but a week before the

sale was to close, Banc of America entered into an agreement in principle with the Securities and Exchange Commission ("SEC") to divest itself of its clearing operation.  Upon learning of the agreement, plaintiffs contacted Banc of America.  Stevens assured plaintiffs that the administrative proceedings with the SEC would not negatively impact the ability of plaintiffs to generate revenue and receive the maximum Contingent Payments.  Stevens also told plaintiffs that Banc of America was acquiring FleetBoston ("Fleet") and that Fleet had a better and larger clearing operation than Banc of America's.  The Agreement closed on March 22, 2004.

On April 1, 2004, after having acquired the Fleet clearing operation, Banc of America liquidated both the Banc of America and the Fleet clearing operations.  According to Stevens, the decision to divest all clearing operations was made by Kenneth Lewis, the Chairman, Chief Executive Officer, and President of Banc of America Corporation.

Plaintiffs allege that, by a variety of means, Banc of America has frustrated the efforts of the DAF Division to generate additional Non-Prime clients and to increase Non-Prime Revenue.  The forms of interference alleged include reassigning the DAF Division's sale force to sell other Banc of America products, improperly categorizing DAF Division clients as Prime Clients and seeking to convert Non-Prime Clients to Prime Clients, and ordering the DAF Division to devote time to servicing Banc of America clients.  The plaintiffs contend that Banc of America's interference in the management of the DAF

Division has undermined the ability of the division to generate revenue from Non-Prime Clients and thus has compromised the ability of the DAF Division to earn Contingent Payments.

Banc of America made its first Contingent Payment in October 2005 ("October 2005 Payment"). The plaintiffs allege that Banc of America deliberately under-calculated the October 2005 Payment by overstating costs and by understating certain average revenue calculations used in determining the payment under the Agreement. The Complaint does not contain any information on the 2004 Target payment or payments to the Revenue Pool.

As previously noted, Wurtsbaugh was hired by Banc of America to run the DAF Division. In several places the Agreement contains provisions that limit Banc of America's obligations if Wurtsbaugh is terminated for cause. As part of the process of joining Banc of America, Wurtsbaugh signed an employment letter ("Employment Letter") that contains both a covenant not-to-compete and a provision designating him an employee-at-will. Before signing the letter, Wurtsbaugh asked why he was being classified as an employee-at-will given that his rights under the Agreement were protected against any termination that was not for cause. Stevens and Cortina assured Wurtsbaugh that the Employment Letter was a formality and that his employment during the term of the Agreement was not in jeopardy.

Wurtsbaugh was terminated without cause in April 2005. Plaintiffs allege that he was terminated to prevent Wurtsbaugh from monitoring Banc of America's use of the DAF Division in ways that violate the Agreement.

7

Plaintiffs filed their complaint on July 6, 2005. At the initial pretrial conference held on December 16, plaintiffs stated that the Complaint filed on December 13 would be their final complaint, except for new information revealed by the accountings provided for under the Agreement.

The defendant filed its motion to dismiss on January 24, 2006. On February 3, the plaintiffs included with their opposition a declaration from Wurtsbaugh with allegations of flaws in the defendant's 2004 Target Payment calculation. The allegations stem from data provided by the defendant on January 19, 2006.

## Discussion

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2), Fed. R. Civ. P. The purpose of this requirement is to give fair notice of a claim and the grounds upon which it rests so that the opposing party may identify the nature of the case, respond to the complaint, and prepare for trial. <u>Swierkiewicz v. Sorema, N.A.</u>, 534 U.S. 506, 512 (2002). Rule 8 is fashioned in the interest of fair and reasonable notice, not technicality, and therefore is "not meant to impose a great burden upon a plaintiff." <u>Dura Pharms., Inc. v. Broudo</u>, 125 S. Ct. 1627, 1634 (2005). "The complaint thus need not set out in detail the facts upon which the claim is based." <u>Twombly v. Bell Atlantic Corp.</u>, 425 F.3d 99, 107 (2d Cir. 2005) (citation omitted). If it is clear, however, that "no relief could be granted under any set of

8

facts that could be proved consistent with the allegations," the claim should be dismissed. Swierkiewicz, 534 U.S. at 514. In construing the complaint, the court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997).

"The Rules do establish more demanding pleading requirements for certain kinds of claims." Twombly, 425 F.3d at 107. These claims, including fraud, must "be stated with particularity." Rule 9(b), Fed. R. Civ. P. To comply with the requirements of Rule 9(b), an allegation of fraud must: "(1) detail the statements (or omissions) the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statement (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004). When pleading scienter as part of a fraud claim plaintiffs "must allege facts that give rise to a strong inference of fraudulent intent." Id. (citation omitted).

I. Breach of Contract

Plaintiffs contend that defendant has violated its obligations under the Agreement in three ways. First, Banc of America breached the Best Efforts Clause. Second, defendant's decisions regarding the DAF Division violated the duty of good faith and fair dealing implied in the Agreement. Third,

9

defendant deliberately under-calculated the October 2005 Contingent Payment. Under the Agreement any disputes are governed by New York law.

To state a claim for breach of contract the complaint must allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Id. at 177 (citation omitted). Where a contract term is ambiguous and material to the breach of contract claim, the claim may not be dismissed for failure to state a claim. Id. at 178. On the other hand, "if an agreement is complete, clear and unambiguous on its face, it must be enforced according to the plain meaning of its terms," id. at 177 (citation omitted), and a breach of contract claim may be dismissed on a Rule 12(b)(6) motion.

> Ambiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

Id. at 178 (citation omitted). Whether a contract term is ambiguous "is a question of law." Id.

A. The Best Efforts Clause

The Best Efforts Clause obligates both parties to "use all reasonable efforts to ... consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement." The plaintiffs argue that this language required Banc of America to "promote and assist" the

10

plaintiffs' efforts to increase the division's Non-Prime Client revenues. Plaintiffs contend that defendant has breached this obligation by utilizing the DAF Division personnel and assets in ways that frustrate efforts to generate new Non-Prime Clients and by terminating Wurtsbaugh without cause.

The plaintiffs fail to contend with the limiting language of the Best Efforts Clause, which provides that nothing in the Agreement shall be read "to limit in any manner whatsoever the ability of [Banc of America] to conduct" its "businesses" or "to control" the DAF Division's business or operations. Reading the Best Efforts Clause to require Banc of America to utilize the DAF Division in particular ways or to refrain from terminating Wurtsbaugh, an at-will employee, would impose limitations on both the conduct of Banc of America's business and its control of the DAF Divison. The unambiguous language of the clause forbids such a reading, and requires dismissal of the claim based on an alleged breach of the Best Efforts Clause.

B.   Duty of Good Faith and Fair Dealing

The plaintiffs also claim a violation of the duty of good faith and fair dealing stemming from the defendant's decisions inter alia to divest its clearing operations, to use DAF Division employees to sell other Banc of America products, to characterize certain DAF Division clients as Prime Clients, and to terminate Wurtsbaugh without cause. Under New York law, a duty of good faith and fair dealing is implicit in every contract. National Market Share, Inc. v. Sterling Nat. Bank, 392 F.3d 520, 525 (2d

Cir. 2004). While the duty includes "any promises which a reasonable person in the position of the promisee would be justified in understanding were included in the contract," <u>id.</u> (citation omitted), the duty is limited by the language of the contract and "can only impose and obligation consistent with other mutually agreed upon terms in the contract." <u>Broder v. Cablevision Systems Corp.</u>, 418 F.3d 187, 198-99 (2d Cir. 2005) (citation omitted). Because the duty arises from the terms of the contract, a breach of the duty of good faith and fair dealing "is merely a breach of the underlying contract." <u>National Market Share</u>, 392 F.3d at 525 (citation omitted).

Having failed to state a viable claim for breach of the Best Efforts Clause, the plaintiffs may not manufacture a breach through invoking the duty of good faith and fair dealing. In order to find that the defendant has breached its duty it would be necessary to read into the Agreement an obligation that the defendant make business choices with the growth of the DAF Division in mind. Implying such an obligation under the Agreement would be inconsistent with the limiting language of the Best Efforts Clause and is thus beyond the scope of the duty of good faith and fair dealing.

The only case cited by the plaintiffs which applies New York law does not dictate a different result. The contract construed in <u>T.R. McClure & Co., Inc. v. TMG Acquisition Co.</u>, No. Civ. A. 99-537, 1999 WL 692683, at *6-8 (E.D. Pa. Sept. 7, 1999), did not contain any language resembling the limiting language in the Best Efforts Clause.

12

C.  Underpayment of the October 2005 Contingent Payment

Plaintiffs have adequately stated a claim for breach of the Agreement through the underpayment of the October 2005 Contingent Payment. Although disagreeing about how to construe certain contract terms, the defendant concedes that plaintiffs have stated a claim that the payment was miscalculated.

II. Fraud

Plaintiffs claim that Banc of America committed fraud through statements made to induce plaintiffs to sell DAFC to Banc of America.[5] They point to statements and omissions relating to defendant's clearing operations, Wurtsbaugh's continued employment with Banc of America, and Banc of America's utilization of DAFC's assets after the sale. Where a fraud claim is brought alongside a breach of contract claim, the claim for fraud must be premised on (1) a legal duty separate from the duty to perform under the contract, (2) a fraudulent misrepresentation collateral or extraneous to the contract, or (3) special damages caused by the misrepresentation and unrecoverable as contract damages. Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 20 (2d Cir. 1996).

---

[5] While, under New York law, tort claims are generally understood to be outside the scope of contractual choice of law provisions, see Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc., 414 F.3d 325, 335 (2d Cir. 2005), the parties agree that New York law also governs the plaintiffs' fraud claims. Where parties agree to the application of the forum law in a diversity action their consent "concludes the choice of law inquiry." American Fuel Corp. v. Utah Energy Development, 122 F.3d 130, 134 (2d Cir. 1997).

Because plaintiffs' allegations relate to the decision to enter into the agreement with Banc of America, plaintiffs' claims are characterized as alleging fraudulent inducement. Under New York law the elements of fraudulent inducement are: (1) a knowingly false representation of a material fact and (2) detrimental reliance thereon. Fax Telecommunicaciones Inc. v. AT&T, 138 F.3d 479, 490 (2d Cir. 1998). The false representation can be either a misrepresentation or the material omission of a fact. Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421 (N.Y. 1996). Reliance means "reasonable" reliance. Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V., 68 F.3d 1478, 1484 (2d Cir. 1995).

In assessing whether reliance is reasonable, the entire context of the transaction is considered "including factors such as its complexity and magnitude, the sophistication of the parties, and the contents of any agreements between them." Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003). When plaintiffs are sophisticated parties and the statement or omission relates to a business transaction that has been formalized in a contract, New York courts are generally reluctant to find reliance on oral communications to be reasonable. See id. at 196; Lazard Freres & Co. v. Protective Life Insurance Co., 108 F.3d 1531, 1543. This reluctance stems from the view that "a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament." Emergent Capital, 343 F.3d at 195 (citation omitted). In the

14

appropriate circumstances, a claim of fraud may be dismissed on the pleadings because as a matter of law a plaintiff will not be able to establish that reliance on the alleged representation was reasonable. See, e.g., id. at 196; Harsco Corp. v. Segui, 91 F.3d 337, 342-43 (2d Cir. 1996).

In order to maintain a cause of action for fraud based on omission, the plaintiffs must show that Banc of America had a duty to disclose. Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela, 991 F.2d 42, 47 (2d Cir. 1993). A duty to disclose may arise 1) from the need to clarify or complete a partial or ambiguous statement; 2) from a fiduciary relationship between the parties; or 3) where one party has information that is not available to the other party and is aware that the uninformed party is acting on the basis of mistaken knowledge. Banque Arabe et Internationale D'Investissement v. Maryland National Bank, 57 F.3d 146, 155 (2d Cir. 1995).

A. Divestiture of Clearing Operation

Plaintiffs assert that the defendant was required to disclose ongoing negotiations with the SEC that led Banc of America to divest its clearing operation. Plaintiffs point to the conversation during the negotiations where Wurtsbaugh discussed the importance of Banc of America's clearing operation with Stevens and Cortina.

Plaintiffs are sophisticated businessmen who negotiated a complex, comprehensive and fully integrated contract in order to sell their business to the defendant. If plaintiffs had felt

15

that defendant's clearing operation was critical to their decision to sell DAFC's assets, they could have protected themselves by inserting appropriate language into the Agreement. See Emergent Capital, 343 F.3d at 196. Instead, the Agreement expressly reserved to Bank of America the right to "divest" itself of any part of its business, and otherwise fully exercise the perogatives of "ownership". The issue of divestiture is therefore not collateral to the contract and any assertion of reliance on the continued presence of the clearing operation is unreasonable. Moreover, the Merger Clause reflects the parties' intention to make the Agreement comprehensive, and further undermines as a matter of law the reasonableness of plaintiffs' asserted reliance on oral representations. See Harsco Corp., 91 F.3d at 343.

B. Acquisition of Fleet

Plaintiffs also allege fraud based on statements made after the parties had signed the Agreement but prior to closing. In particular, they point to Stevens' statements that Banc of America was acquiring Fleet which had an even better clearing operation than Banc of America, and that the administrative proceedings with the SEC would not negatively impact the ability of plaintiffs to maximize the Contingent Payments. Because the plaintiffs have not shown the existence of a misrepresentation that was extrinsic to the contract, this fraud theory must also be dismissed. As already noted, the Agreement acknowledged Banc of America's authority to control its own business, including

divesting any assets.

C.   Assurances Regarding At-Will Employee Status

Finally, the plaintiffs allege fraud based on statements made by Stevens that Wurtsbaugh's classification as an at-will employee was merely a formality and that his employment with Banc of America would not be at jeopardy during the term of the Agreement. "Because an at-will employee may be terminated at any time, any reliance on any representations of future intentions, such as job security...is deemed unreasonable as a matter of law." Brady v. Calyon Securities (USA), 406 F.Supp.2d 307, 316-17 (S.D.N.Y. 2005) (collecting cases). Wurtsbaugh's employment contract defined his status as that of an at-will employee. Any reliance on oral representations about the term of his employment was therefore unreasonable under New York law.

III. Unjust Enrichment

Plaintiffs concede that their claims for unjust enrichment are only viable as long as the validity of the Agreement is called into question. See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005). The plaintiffs' claim for unjust enrichment is therefore dismissed.

IV. Declaratory Judgment

Plaintiffs seek a declaratory judgment that the covenants not-to-compete in the Agreement and the Employment Letter are

unconscionable, commercially unreasonable, and unenforceable. The motion to dismiss this claim is denied.

## Conclusion

Defendant's motion to dismiss is granted with two exceptions. The motion is denied to the extent it addresses plaintiffs' claims for breach of contract relating to the October 2005 payments and the plaintiffs' claim for a declaratory judgment. The plaintiffs may amend the Complaint to plead a claim regarding the calculation of the 2004 Target Payment.

DATED: New York, New York
June 20, 2006

```
                                   /s/ Denise Cote
                                   _____
                                   DENISE COTE
                                   United States District Judge
```